(C. D. 173)

Marr Duplicator Co. *v.* United States

United States Customs Court, Second Division

(Decided June 6, 1939)

*Barnes, Richardson & Colburn* (*Samuel M. Richardson* and *Hadley S. King* of counsel) for the plaintiff.
*Webster J. Oliver,* Assistant Attorney General (*Joseph E. Weil,* special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: These are suits against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on particular importations of stencil paper. Duty was levied thereon at the rate of 30 per centum ad valorem under paragraph 1409 of the Tariff Act of 1930 as paper not specially provided for. It is claimed that said paper is properly dutiable at the rate of 5 cents per pound and 15 per centum ad valorem under paragraph 1405 of said act as surface-coated paper not specially provided for.

The sole issue, therefore, is whether the paper in question is a surface-coated paper within the meaning of said paragraph 1405. A similar question was before the United States Court of Customs and Patent Appeals in *United States* v. *Duratex Stencil Co.,* 19 C. C. P. A. 341, T. D. 45499, and *W. W. Erskine* v. *United States,* 22 C. C. P. A. 285, T. D. 47345. In each instance the merchandise consisted of so-called yoshino paper which had been subjected to a solution of gelatin which not only covered but surrounded and impregnated the fibers of the paper. The appellate court held that such papers were not coated within the meaning of said paragraph 1405.

In the instant case the plaintiff claims that while the involved paper originally consisted of yoshino paper impregnated by a solution of gelatin, as in the cited cases, nevertheless one surface thereof, subsequent to the drying of the impregnated solution, was further coated with a substance other than gelatin. In other words, the plaintiff contends that the present paper is not only an impregnated paper, but that it is also a paper with a coated surface or surfaces within the meaning of said paragraph 1405. But this claim is restricted to the merchandise represented by items marked 33 and 34 on the invoices.

On the other hand, the Government contends that the paper involved herein is similar in all material respects to that passed upon in the cited cases, and therefore has been properly classified by the collector.

The record is quite voluminous, covering some 256 typewritten pages of oral testimony as well as numerous exhibits. Among the

latter is a deposition of D. C. Leicester, technical manager of the Ellans Duplicator Co., the English manufacturer of the imported paper. This deposition, with the exception of certain testimony of witnesses in this country identifying and proving the samples of the imported merchandise, constitutes the only evidence offered by the plaintiff.

In answer to certain direct interrogatories propounded in said deposition, the deponent testified that he had received special training in science and had ten years' experience in research work in the manufacture of stencil paper; that the sample marked Exhibit 2 and attached to his deposition is representative of all of the stencil paper covered by invoice item 34; that said paper is made by impregnating bibulous tissue with a first coating of a protein composition; that thereafter a second coating consisting of an entirely different composition is applied; that the second coating remains upon the surface of the stencil sheet without impregnating it; that the first coating completely fills the interstices of the paper; that the second coating may be removed without removing the material constituting the first coating, either by solution in a suitable solvent or by manipulation with a sharp knife blade, as the two coatings are completely separate and distinct; that Exhibits 1 and 2, attached to the deposition, illustrate the result obtained by removing the coating from one-half of the No. 34 paper by solution and by the use of a sharp knife, respectively; that Exhibit 3, attached to the deposition, correctly represents the white stencil paper covered by invoice items 33; that there is no difference in the method of manufacture of the white and the blue stencil paper; that the imposition of the second coating is a necessary part of the manufacturing process, its purpose being to improve the paper for stylus work and to give it an improved appearance as well as additional strength; that Illustrative Exhibit B shows a stencil paper, part of which has been impregnated with the protein composition, and another part which has been thereafter coated with the chemical composition.

In answer to cross-interrogatories the witness testified that the first coating contains a protein known as gelatin; that it does not contain any nitrocellulose; that the first coat was applied in solution to the basic paper, the solvent being water; that the second coat contains no proteins but does contain oils and fatty materials, and was applied in solution to the basic paper, the solvent used being a mixture of industrial methylated spirits of ether; that Exhibit 4, attached to the deposition, consists of a single sheet of paper of the type designated on the invoice as No. 33, to which the first coating has been applied and which is in condition to receive the second coating; that Exhibit 5 consists of a single sheet of paper of the type designated on the invoice as No. 34, to which the first coating has been applied and which is in

condition to receive the second coating; that the first coating contains a protein which is gelatin, but does not contain any nitrocellulose; that the reason for the witness' conclusion that the second coating does not intermingle with the first coating is that the first coating is completely dried and finished before the second coating is applied and that the solvent used for applying the second coating has no solvent action upon the protein material employed in the first coating; that therefore there is no intermingling of coating by direct chemical action, the second coating remaining as a second film on the surface of the first coating; that if the second coating is removed by means of a solvent it is inevitable that the said solvent will remove some of the oils contained in the first coating, but the percentage of said oils so removed is indefinite and would depend entirely on the type of solvent used and the length of time of the immersion of the paper in said solvent; and that on the other hand if the second coating is removed physically by means of a knife blade there would appear to be no reason why any part of the first coating would need to be removed with it.

The Government offered in evidence the testimony of five witnesses.

The first, Alex B. Davis, a consulting chemist with twenty years' experience, testified that he received from the court, through counsel for the Government, a number of blue and white sheets of paper similar to those represented by Exhibit 2 and that he made chemical analyses thereof; that he found the blue sheet to consist of 61.34 per centum of three fatty acids; 0.61 per centum of nitrocellulose; 14.7 per centum of Japanese yoshino paper; 5.22 per centum of protein in the form of gelatin; and 18.12 per centum of blue pigment. On objection of counsel for the plaintiff this testimony was stricken out as irrelevant and immaterial. Counsel for the Government then offered similar evidence in regard to the white sheet, which proof was likewise excluded on the same objection.

The witness then testified that he had examined Exhibits 1 to 8, accompanying said deposition, both chemically and microscopically; that he found a paper the base sheet of which was yoshino filled with a substance composed of gelatin and nitrocellulose commingled with oil, which substance completely filled the interstices of the fibers; that he first cut out a cross section of the sheet and examined it under the microscope; that he then floated some of the paper in boiling water and by boiling out the gelatin separated the gelatin portion from the nitrocellulose portion; that then the interlaced yoshino paper bore within the interstices a nitrocellulose mass that appeared to have a honeycomb structure, the holes being due to the fact that the gelatin had been dissolved out in spots; that the photographs admitted in evidence as Exhibits 6 and 7 represent a sample of Exhibit 1 after the boiling process; that the boiling process was

necessary in order to ascertain whether the nitrocellulose, which is insoluble in water, impregnated the fiber, or was simply on the surface; that Exhibit 6 shows yoshino paper fiber, the interstices of which are filled with a honeycomb structure of nitrocellulose, the honeycomb structure indicating the points at which the gelatin has been removed by the boiling, showing that the nitrocellulose structure was not continuous and indicating as intermingling of the gelatin and nitrocellulose; that Exhibit 7 shows the same as Exhibit 6 except in a more detailed manner; that he made an analysis or test of Exhibit 2 accompanying Exhibit 5, being a sample of stencil paper which, according to plaintiff's testimony, had a portion of the second coating removed by a knife; that he found in the scraped portion of the sheet some nitrocellulose, a sample of which in a bottle was admitted in evidence as Exhibit 8; that he made a scraping of Exhibit 2 in this case with a safety razor blade and found both nitrocellulose and gelatin in the fibers, a sample of the scrapings in a bottle being admitted in evidence as Exhibit 9; that industrial methylated spirits of ether is a solvent for the oils, fats, and waxes contained in Exhibits 4, 5, 6, and 7, which are parts of Collective Exhibit 5; that methylated spirits of ether are solvents for the oils in the first coating and also for the nitrocellulose in the second coating, so that when the second coating is applied there is an intermingling of the two; that therefore the nitrocellulose would penetrate and impregnate not only the fiber but the entire gelatin mass of the first coating; that this would take place due to the operation of osmosis; that a sample of nitrocellulose removed from the bottom of a sheet of this paper was in a bottle which was admitted in evidence as Exhibit 10; that a stencil sheet is not porous, otherwise it would not hold the ink when it is applied to a duplicating machine; but when a powerful solvent is applied it will become porous; that the witness does not agree with the statement of the plaintiff's witnesses that the second coating remains upon the surface of the stencil sheet without impregnation; and that every examination which the witness made showed that the second coating, as well as the first, impregnated the interstices of the yoshino paper fiber.

On cross-examination the witness testified that he placed a piece of Exhibit 2 over a solvent which touched the bottom surface of the paper but did not touch the edges; that by a process of osmosis the nitrocellulose was drawn through the paper into the solvent; that there is no difference in the thickness of the paper in question on the side which has the second coating on it and the other side; that the witness scraped some of the substance from the surface of the paper and analyzed it; that he extracted the nitrocellulose with ethyl acetate and found 0.0031 grains, the weight of the entire scraping being 0.1864 grains or 1.66 per centum; that the witness did not

know whether this small amount of nitrocellulose was on the top or the bottom of the sheet scraped; that all he knew was that it was in the sheet after he had scraped off approximately one-half of it; that there was more nitrocellulose in the scraping than in the portion of the sheet left after the scraping; that there was only 1 or 2 per centum of nitrocellulose in the whole original sheet; that he did not measure the particular paper at bar but that stencil paper as a rule is from $3/1000$ to $5/1000$ of an inch thick; that in taking the photographs admitted in evidence as Exhibits 6 and 7 the objective or portion of the sheet examined was not less than one-eighth of 1 inch in diameter; that the microscope used was set at 100 diameters; that the photographs in question are photographs of the flat surface of the second coating after the first coating had been boiled off in water; that neither of the photographs was a photograph of the cross-section of the paper; that the boiling performed by the witness in his examination of the paper dissolved the gelatin together with some of the fats; that nitrocellulose and gelatin are incapable of chemical combination, but they can be combined physically in the form of an emulsion stencil; that there was no nitrocellulose in the first coating until the second coating was applied; that it was not true that the nitrocellulose was all on top of the paper and could be scraped off with a knife; that the witness' idea of a coating was an application without any impregnation; that he had taken out the nitrocellulose from the paper and left the gelatin; that one side of Exhibit 1 of Collective Exhibit 5 has a shiny surface which is different in appearance from the reverse side; that the reason for this is that there is more nitrocellulose on one side and more gelatin on the other, the nitrocellulose being glassy which causes the shiny appearance; that he tried to cut a cross-section of the paper with a microtone but gave it up; that the witness had put water on the shining side which swelled it and went on through; that the so-called second coating is not a practical varnish on the surface of the paper because a varnish would be a dense film and would not have holes like this; that before the gelatin was taken out by the boiling process you cannot see the holes; and that both of the photographs (Exhibits 6 and 7) were taken after the boiling process.

On redirect examination he testified that a mixture of methylated spirits of ether would pull nitrocellulose through the paper from the upper surface through the entire yoshino sheet, and that an application of shellac, if applied to a sheet of paper, would go all the way through the sheet.

On recross-examination the witness testified that he did not see why the boiling process physically displaced any of the components of the paper.

The second expert witness called by the Government was Isidore Schnopper, a Government chemist in the customs laboratory at New York City. After being duly qualified he testified that he made a microscopic and chemical examination of both samples of the white and blue stencil sheets in controversy; that he first made a chemical examination and found that the sheets contained fats and oils, a gelatin cellulose, nitrocellulose, and some inorganic filler, together with yoshino paper, and that the blue sheet contained, in addition, a small amount of blue dye; that subsequently he took one of the sheets, placed it in hot water for some time, and noted that most of the gelatin went into solution, and that some of the oils became separated out; that he then removed a portion of the sheet and put it under the microscope; that under the microscope he saw a honeycomb-like structure containing yoshino fibers and in the interstices of the fibers were some substances which, on subsequent analyses, he found to be nitrocellulose and also some gelatin; that he examined that portion of Exhibit 2 of Collective Exhibit 5 from which the second coating had been removed and found nitrocellulose therein; that he scraped a piece of the same exhibit with a knife and found from an examination of the scrapings that they contained nitrocellulose; that industrial methylated spirits of ether is a solvent for oils and fats; and that, if applied with nitrocellulose in a second coating to the first coating of yoshino paper, would penetrate the entire mass causing a commingling of the original gelatin and the superimposed nitrocellulose.

On cross-examination he testified that in his experiment the water was not boiling but of a temperature of from 85 to 90 degrees; that chemical nitrocellulose will not combine with gelatin or anything else, but that it may be combined physically with some of the oil; that he could not say how much of the nitrocellulose he found; that he made a qualitative and not a quantitative analysis; that in making his test he used a quarter of the sheet of stencil paper in question; that he did not think it was necessary to find out how little nitrocellulose there was left in the paper after the second coating had been removed; that he made no quantitative analysis of the scrapings made with a knife; that industrial methylated spirits of ether, acetone, and ethyl acetate would all extract the nitrocellulose, fats, and oils, leaving the gelatin behind; and that after everything but the gelatin had been removed the paper became a stiff piece of paper and was an impregnated sheet.

The third expert witness called by the Government was Lewis B. McSorley, chief chemist in the customs laboratory at New York City. He testified that he had been associated in his work with the witness, Schnopper, and if asked the same questions would testify in substantially the same way; that he took a piece of Exhibit 2 and at-

tempted to scrape off the outside coating, but not with any success; that he subsequently examined the scrapings under the microscope and found a mixture of fibers and blue material; that if a sheet of yoshino, the base paper, which had had applied thereto a solution containing gelatin, oils, and fats, was permitted to dry, and if after drying there had been applied to it a second application containing nitrocellulose, fats, and oils and a solution of industrial methylated spirits of ether, the result, in the witness' opinion, would be a penetration of the second coating into the basic paper, due to the law of osmosis.

On cross-examination the witness testified that the solvents would go down into the original sheet carrying with them whatever they had in solution; that he believed that all of the constituents of the second coating would go through the paper by osmosis so as to be identifiable on the reverse side; that whether, if a completely impregnated paper dried had applied to it a comparatively slight second coating which also immediately dried, the same physical reaction would take place, he could not say it would take place to the same extent; and that any coating must penetrate to some extent in order to adhere to the article which is coated.

Upon this record we find the following facts:

1. That the stencil paper constituting the imported merchandise at bar consists of an extremely porous Japanese yoshino paper, to one surface of which was applied in the first instance a solution of gelatin, oils, and fats, the solvent being water, which solution not only covered the surface but impregnated the interstices of the fibers of the entire basic paper.

2. That after the paper was thoroughly dried there was then applied to it a solution of nitrocellulose oils, and fatty materials, the solvent in this case being a mixture of industrial methylated spirits of ether.

3. That as the result of the second application the paper in its imported condition has a shiny appearance on the surface so treated, as compared with a dull appearance on the reverse side.

4. That if the paper in its imported condition is subjected to a boiling process some traces of nitrocellulose will be found to have penetrated through the paper.

5. That if the shiny surface of the paper in question is scraped with a knife, and the second application of coating substantially removed, the remaining portion of the paper will show upon examination extremely slight traces of nitrocellulose.

Upon these facts counsel for the Government in his brief filed herein contends that the paper in question is impregnated and therefore not a coated paper within the meaning of paragraph 1405 of the Tariff

Act of 1930, as judicially enunciated by the United States Court of Customs and Patent Appeals in *United States* v. *Duratex Stencil Co.*, 19 C. C. P. A. 341, T. D. 45499, and *W. W. Erskine* v. *United States*, 22 C. C. P. A. 285, T. D. 47345.

Upon the entire record we do not agree with this contention. It is unquestionably true, as admitted by counsel for the respective parties, that the paper in question was first thoroughly impregnated with a solution of gelatin, oils, and fats, all of the interstices of the fibers of the basic paper being completely filled; that the paper was then thoroughly dried before a separate and distinct solution of nitrocellulose was superimposed upon the dried surface which had already been treated with the gelatin solution.

The fact that, after the boiling process and the removal thereby of the gelatin, some traces of nitrocellulose are found throughout the fibers, in our opinion, is not sufficient to exclude this paper from the provision for paper with a coated surface or surfaces within the meaning of paragraph 1405 of the Tariff Act of 1930. The circumstance that it was subjected to a second coating of nitrocellulose, different from that first applied and with which it was already impregnated, in our judgment, makes the second application a coating process.

In the case of *Knauth, Nachod & Kuhne et al.* v. *United States*, 4 Ct. Cust. Appls. 11, T. D. 33199, the converse of the present situation was before the appellate court. There, the merchandise involved consisted of a so-called windowphanie paper. It was assessed for duty under the provision in paragraph 411 of the Tariff Act of 1909 for "papers with coated surface or surfaces, not specially provided for * * * printed," and was claimed to be properly dutiable under the provision in the same paragraph for "papers * * * with the surface decorated or covered with a design, fancy effect, pattern or character," etc. In holding that the paper in question was not a surface-coated paper, the court said:

The following definitions are also given as bearing upon the present issue:
Murray's Dictionary:

*Coat. v.* 2. To cover with a surface layer or coating (or with successive layers) of any substance, as paint, tar, tinfoil, etc.; also predicated of the substance covering the surface.

Standard Dictionary:

*Coat. v. t.* 1. To cover or spread over with a surface layer, as of paint, tar, etc. 2. To cover with or as with a coat.

Century Dictionary:

*Coat. n.* 8. A thin layer of a substance covering a surface; a coating; as a coat of paint, pitch, or varnish; a coat of tinfoil.
*Coat. v. t.* 2. To overspread with a coating or layer of another substance; as to *coat* something with wax or tinfoil.

A consideration of these definitions and of the record leads the court to the conclusion that the paper now in question is not surface coated by the oil with which it is treated. The manufacture of the paper involves the complete saturation of the entire body and substance of the article in order to make it translucent. This condition of translucency is absolutely essential to the use for which the paper is designed. In the absence of the oil the paper would be opaque, and therefore unfitted for use as a covering for window panes. * * * It cannot properly be said that the oil is a surface coating which only incidentally affects the body of the paper; to the contrary, the oil is not designed to be a surface coating at all, but is intended to effect a thorough and even saturation of the article throughout. * * * The method whereby the oil is applied to the paper bears some resemblance to the process of printing, because the paper is passed through a set of rollers. But the result reached is simply a saturation of the article such as might less efficiently be accomplished by immersing it in a bath of the same liquid. This fact marks the difference between the process just described and the mere painting of the exterior of an article. In the latter case the purpose would be to reach the surface of the article only, and if the paint found its way beneath the surface that result would be unintentional and would not be an essential part of the process.

In the instant case the paper in question in the first instance was saturated or impregnated with a solution of gelatin filling all the interstices throughout the fibers of the basic paper, rendering the paper up to that stage an impregnated and not a coated paper within the decisions of this court and the Court of Customs and Patent Appeals. The manifest purpose of the second coating applied after the paper was thoroughly dried was to reach the surface of the article only and to give the paper a more finished appearance, as shown by an examination of the sample admitted in evidence herein as Illustrative Exhibit B. If, as in the case just cited, some of the nitrocellulose had found its way beneath the surface, that result would be unintentional and would not be an essential part of the process, and was not within the design and purpose of the makers of the paper. The evidence clearly shows that where the second coating has been scraped off by means of a knife or safety razor blade, the amount of the nitrocellulose found in the remaining portion of the paper was so infinitesimal that it could well be deemed negligible, and thus may be disregarded in determining the classification of the paper.

In the case of *Meirowsky Bros.* v. *United States*, T. D. 35496 (G. A. 7732), 28 Treas. Dec. 978, this court had under consideration the proper tariff classification of certain paper described in the invoice as "insulating paper." It was assessed with duty under the provision in paragraph 324 of the Tariff Act of 1913 for "paper with coated surface or surfaces not specially provided for"; it was claimed to be properly dutiable at the rate of 25 per centum ad valorem under paragraph 332 of said act as paper not specially provided for. In affirming the classification of the collector, this court (then the Board of General Appraisers) said:

Both the record and the samples of the merchandise in evidence conclusively show that a coating of varnish has been applied to the paper in question.

And then after setting forth the definitions of the word "coat" quoted with approval in the case of *Knauth, Nachod & Kuhne et al.* v. *United States, supra,* this court (in the *Meirowsky Bros.* case, *supra*), speaking through Fischer, Judge, continued:

In the words of the importer, who appeared herein as a witness in his own behalf, "the paper is carried through a tank that is filled with varnish—simply carried through and the varnish adheres to the paper and soaks into it. Then the paper is put in a drying room, put in a certain temperature, until it is dry."

It was held in the *Knauth* case, *supra*, that paper merely saturated with linseed oil and no varnish or other substance applied to produce an added surface, was not a surface-coated paper. Here, however, an examination of the samples in evidence satisfies us that, while both surfaces of the paper are completely covered with a coat of varnish, the latter has not completely saturated or permeated the paper. This fact is made clearly apparent by a close inspection of a tear in the paper.

In our opinion the merchandise consists of coated paper and as such we hold it dutiable under paragraph 324, as assessed.

Here again it is to be noted that the paper in the instant case cannot be said to have been saturated with the additional substance, a material applied in the form of a coating. Even a cursory examination of the exhibits in the case disproves such a contention. To claim that the paper is impregnated must mean that it is saturated with two different materials at the same time, even though the material used in the first application was permitted to dry before the second material was applied. Surely when a paper is saturated to the point of complete impregnation, any further application to one or both surfaces, particularly of another material, is something more than a continuation of the impregnation process. It is nothing more nor less than applying a coating to the surface of an impregnated paper. As necessarily incidental to such a coating process some insignificant portion of the coating material may soak through and become commingled with the impregnating material. But certainly that fact should not be advanced to defeat the manifest congressional intent in the premises, to wit, to classify such a paper as a surface-coated paper.

Upon the established facts and the law applicable thereto we hold that the stencil paper constituting the imported merchandise at bar represented by invoice items 33 and 34 is properly dutiable at the rate of 5 cents per pound and 15 per centum ad valorem under paragraph 1405 of the Tariff Act of 1930 as a surface-coated paper not specially provided for, as alleged by the plaintiff. That claim is therefore sustained, but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.