(C. D. 1768)

John J. Coates Co. et al. v. United States

United States Customs Court, Second Division

(Decided March 15, 1956)

*Michael Stramiello, Jr.*, for the plaintiffs.

*Warren E. Burger*, Assistant Attorney General (*Alfred A. Taylor, Jr.*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: The protests listed in exhibit X, annexed to this decision and made a part hereof, which were consolidated for the purposes of trial, raise the question of the proper dutiable classification of certain paper, invoiced variously as "Safir Lampshade Parchment Paper," "Lampshade Parchments," "Lampshade Paper," and "Lampshade Board." This paper was alternatively classified either as uncoated paper, embossed, within the provisions of paragraph 1405 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, with the consequent assessment of duty at the rate of $4\frac{1}{2}$ cents per pound and 10 per centum ad valorem; or as greaseproof paper, which is provided for in said paragraph 1405, as modified by the Annecy Protocol to said General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T. D. 52373, supplemented by Presidential proclamations of April 27, 1950 (85 Treas. Dec. 116, T. D. 52462), and of May 13, 1950 (85 Treas Dec. 138, T. D. 52476), at the rate of $1\frac{1}{2}$ cents per pound and $7\frac{1}{2}$ per centum ad valorem.

As submitted for decision herein, the claim of plaintiffs is that this merchandise is vegetable parchment paper and is, therefore, dutiable at the rate of 1 cent per pound and 5 per centum ad valorem within said paragraph 1405, as modified by said General Agreement on Tariffs and Trade, either directly or by virtue of the similitude provisions of paragraph 1559 of said act.

The tariff laws which affect this action provide as follows:

Paragraph 1405, as modified by T. D. 51802, *supra*.

Papers with coated surface or surfaces, not specially provided for__$2\frac{1}{2}$¢ per lb. and $7\frac{1}{2}$% ad val.

Papers with coated surface or surfaces, embossed or printed otherwise than lithographically, and papers wholly or partly covered with metal or its solutions (however provided for in paragraph 1405, Tariff Act of 1930), or with gelatin, linseed oil cement, or flock; uncoated papers, including wrapping paper, with the surface or surfaces wholly or partly decorated or covered with a design, fancy effect, pattern, or character, except designs, fancy effects, patterns, or characters produced on a paper machine without attachments, or produced by lithographic process; any of the foregoing, whether or not embossed, whether or not printed otherwise than lithographically, and whether or not wholly or partly covered with metal or its solutions, or with gelatin or flock_____ 4½¢ per lb. and 10% ad val.

    *        *        *        *        *        *        *

Vegetable parchment paper_____ 1¢ per lb. and 5% ad val.

Paragraph 1405, as modified by T. D. 52373, as supplemented, *supra.*

Grease-proof and imitation parchment papers which have been [have not been] supercalendered and rendered transparent or partially so, by whatever name known, and all other grease-proof and imitation parchment paper, not specially provided for, by whatever name known_____ 1½¢ per lb. and 7½% ad val.

Paragraph 1559.

That each and every imported article, not enumerated in this Act, which is similar, either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned; * * *. If two or more rates of duty shall be applicable to any imported article, it shall be subject to duty at the highest of such rates.

At the trial, counsel for plaintiffs offered in evidence as exhibit 1 a stipulation of the parties, which recites the following agreed facts:

1. The merchandise covered by the protests listed in "Exhibit X", attached hereto and made a part hereof, consists of paper imported by the plaintiffs herein and was classified by the Collector of Customs at the port of New York as "uncoated paper, embossed" or as "greaseproof paper" under the provisions of paragraph 1405 of the Tariff Act of 1930, as amended and modified, and duty was assessed thereon at the appropriate rates provided in said paragraph.

2. Subject to the approval of the Court, the protests listed in said "Exhibit X" are amended so that all claims made therein are abandoned except the claim that the merchandise covered thereby is classifiable as "vegetable parchment paper" under the provisions of paragraph 1405 of the said Act, or in the alternative, is dutiable as "vegetable parchment paper" in said paragraph 1405 by virtue of the similitude provisions of paragraph 1559 of said Act, and to include said claims in any of the said protests in which said claims have not been made.

3. The merchandise covered by the protests as aforesaid was manufactured by the following process: cellulose fiber sheets, the same in all material respects

as "Exhibit A" were embossed on embossing machines to produce a design and effect previously determined, resulting in embossed sheets which were the same in all material respects as "Exhibit B"; said embossed sheets were stored for several weeks to permit the embossing impressions to become fixed and to dry; the dried sheets were then immersed in a solution of sulphuric acid for the purpose of parchmentizing the sheets; the sheets so embossed and parchmentized were then immersed in successive baths of a resinous solution to permeate and coat the sheets therewith; the sheets were then hung on racks for 10 to 14 days for drying, after which they were wound into rolls or cut into sheets of predetermined sizes, in which condition they were imported into the United States; "Exhibit C" is a sample of said merchandise as imported.

4. The said imported merchandise was sold to manufacturers of lampshades within the United States who manufactured them into lampshades.

5. Tests to determine the water and grease resistance of samples taken of the imported merchandise were made by the Electrical Testing Laboratories, Inc., located at 2 East End Avenue, City and State of New York; the results of said tests showing the degree of resistance to water and grease of the imported merchandise appear in "Exhibit D"; Said results are within the limits of water and grease resistance for vegetable parchment paper.

6. "Exhibit E" is a pamphlet published by the Vegetable Parchment Manufacturers' Association located at 122 East 42nd Street, City and State of New York, giving the method of producing, the properties and uses, and other pertinent data of vegetable parchment paper.

7. The protests listed in "Exhibit X", as amended, are submitted on this stipulation, the plaintiffs waiving the right to the first docket call and further amendment of these protests.

8. Subject to the approval of the Court, the plaintiffs shall have until May 13, 1955, to file a brief herein and the defendant 30 days thereafter.

Motions to amend, as hereinabove noted, are hereby granted.

For the record, the exhibits referred to in the foregoing stipulation were received in evidence as plaintiffs' exhibits A, B, C, D, and E, respectively.

Although the stipulation of fact does not expressly so indicate, if all of this paper was manufactured by the same process, from the same material, and, after importation, devoted to the same ultimate use, it is reasonable to assume that it possesses chracteristics which are the same in all essential respects. And this must be so, regardless of the many different item numbers which are listed on the invoices covered by the protests. No explanation is here offered for the collector's action in invoking two provisions of the tariff law for the classification of the same merchandise, and we can only surmise either that paper of this type is not readily identifiable within the framework of the tariff law, or that there is ambiguity in the language of the relevant provisions. In either event, much doubt beclouds the issues which we are herein asked to determine.

Counsel for plaintiffs contends that classification of some of the merchandise at bar as *uncoated* paper, embossed, is patently erroneous, in view of the stipulated fact that "the sheets so embossed

and parchmentized were then immersed in successive baths of a resinous solution to permeate and *coat* the sheets therewith." [Italics added.]

Counsel for the Government seeks to escape from the ordinary understanding of this language by the argument that the words "permeate" and "coat" are mutually exclusive. It is urged that "The use of the word 'permeate' negatives the idea of coating," and dictionary definitions of these words are quoted in an attempt to establish their contrary meanings.

We are not convinced thereby that paper may not be both impregnated and coated. On the contrary, we are inclined to the view that the stipulation means exactly what it says. In this conclusion, we are aided by the appearance of the finished product in evidence as plaintiffs' exhibit C. This plainly shows that the paper, which counsel for defendant concedes has been permeated with a resinous solution, is also coated. As has been frequently stated, samples are ofttimes potent witnesses. *United States* v. *Bernard, Judae & Co.*, 18 C. C. P. A. (Customs) 68, T. D. 44029; *United States* v. *Marshall Field & Co.*, 19 C. C. P. A. (Customs) 331, T. D. 45483; *United States* v. *The Halle Bros. Co.*, 20 C. C. P. A. (Customs) 219, T. D. 45995.

Moreover, in the case of *Marr Duplicator Co.* v. *United States*, 2 Cust. Ct. 435, C. D. 173, it was held that certain stencil paper was both impregnated and coated, this court stating:

* * * Surely, when a paper is saturated to the point of complete impregnation, any further application to one or both surfaces, particularly of another material, is something more than a continuation of the impregnation process. It is nothing more nor less than applying a coating to the surface of an impregnated paper. * * *

We do not think that the circumstance that different solutions were used for impregnating and coating the paper involved in the *Marr Duplicator Co.* case, *supra*, materially affects the proposition that paper may be both impregnated and coated. Accordingly, it follows that the collector's classification of some of the merchandise at bar as uncoated paper, embossed, was erroneous.

However, since the rate of duty provided in paragraph 1405, as modified by the General Agreement on Tariffs and Trade, *supra*, for papers with coated surface or surfaces, embossed, is the same as that provided for uncoated papers, with the surface or surfaces decorated or covered with a design, fancy effect, pattern, or character, the finding that the subject merchandise is coated paper does not resolve the fundamental questions of whether it is vegetable parchment paper on the one hand, or greaseproof or imitation parchment paper on the other, and if it be the former, what, if any, is the effect of the processes of embossing and coating to which it has been subjected.

As to the question of whether the words "greaseproof" and "imitation parchment," as applied to paper, are synonymous and interchangeable terms, an affirmative answer is dictated by the decision of this court in the case of *Oklahoma Paper Co. et al.* v. *United States*, 58 Treas. Dec. 51, T. D. 44143, wherein it was stated:

We believe that this judicial interpretation of the congressional will, and the literal reenactment of the 1909 provision in the acts of 1913 and 1922, as well as the long-continued administrative practice thereunder, effectually dispose of the contention of the Government that the use of the conjunctive "and" instead of the disjunctive "or" in the phrase "grease-proof and imitation-parchment paper" indicates a legislative intent to provide for two different kinds of paper. Manifestly, if the paper is grease proof it must of necessity imitate parchment paper, and vice versa, because the one necessarily possesses the general essential characteristics of the other. This view is amply supported by the testimony of a number of paper merchants and jobbers that the terms are synonymously used in trade to denote the same types or grades of paper.

The provision for vegetable parchment paper by that name was first incorporated in the Tariff Act of 1922. Prior laws, as far back as the act of 1894, contained provisions for parchment paper, and, in the act of 1909, a separate provision for greaseproof and imitation parchment paper was added. In the case of *Germania Importing Co.* v. *United States*, 4 Ct. Cust. Appls. 29, T. D. 33221, decided under the 1909 law, the legislative history of these provisions was reviewed, and the characteristics of both types of paper, predicated upon the evidence in the case, were described as follows:

From the testimony in the case as well as from the foregoing quotations, it appears that real parchment paper is made from vegetable fiber, not from wood pulp; that it is unsized; that it is treated with dilute sulphuric acid; that the resulting paper is dull in finish, dense, hard, and hornlike; it is grease proof, waterproof, translucent, and even poorly transparent; and is much more tenacious than the original material. It is, however, denied in the testimony that such paper is absolutely grease proof, and it is stated that it varies in this particular according to its quality and thickness. It is used for drawing, bookbinding, as covers for corks in medicine bottles, for filtering in sugar manufacture and in refining gutta percha, as a wrapping paper for greasy substances, as a casing for sausages, and in many other ways. In the tariff act it is made dutiable under the general name of parchment paper.

The kind of article which is involved in the present case, and which is assessed under the classification of imitation parchment paper, is made in this country from wood pulp which is produced by the sulphite process. In the course of manufacture the stock is subjected to an unusually extended or continued process of beating, which reduces it to a gelatinous condition. This produces a close and packed texture in the fiber in proportion to the degree of gelatinization. In case the stock is not beaten as just explained, the resulting product would simply be fiber paper. The first finished product of the process above described is a paper with a dull finish, dense and hard, resembling parchment paper in various ways, especially in the characteristic hornlike appearance which is above noted. The paper is not waterproof and is but partially grease proof; that is, it is not entirely impervious to grease, but nevertheless it has the quality of resisting grease to a limited

extent. The paper is also more tenacious than similar stock otherwise treated; it is translucent and imperfectly transparent. Some of the paper which is thus produced is afterwards moistened and run through supercalender rollers under heat and pressure. By means of this treatment it loses its dull finish and becomes very glossy; it also becomes more perfectly transparent, which greatly increases its usefulness. The papers thus produced are used for a variety of purposes. The supercalendered paper, to which class the importation belongs, is especially serviceable as an outer wrapping for bottles and boxes, as the labels on these may easily be read through the transparent covering; for the same reason it is used in "window envelopes," and as a sanitary protector for telephone receivers. Both kinds are also used as a wrapping for cakes and other like articles such as do not require a perfectly greaseproof covering.

Thus, it appears that, prior to the enactment of the Tariff Act of 1922, the provision for parchment paper referred to a paper made from an unsized sheet of vegetable fiber, treated with dilute sulfuric acid, which was dull in finish, dense, hard and hornlike, greaseproof, waterproof, translucent,. and even poorly transparent, whereas the provision for greaseproof or imitation parchment paper described a paper manufactured from sulfite wood pulp, subjected to an extended beating process, which resembled parchment paper in many of its characteristics, but was not waterproof, and was only partially greaseproof.

That these meanings have persisted, and that Congress intended no change in interpretation when it inserted the word "vegetable" in the provision for so-called real parchment paper in paragraph 1305 of the Tariff Act of 1922, is evidenced by the following statements in the 1921 Summary of Tariff Information Relative to the Bill, H.R. 7456, which subsequently became the Tariff Act of 1922:

Vegetable parchment paper (M-3) is an unsized or waterleaf paper made preferably of cotton rags, vegetable fiber, or sulphite wood pulp treated with dilute sulphuric acid. It is dull in finish, dense, hard and hornlike; it is grease proof, waterproof, translucent, and to a limited extent transparent. It is used for drawing, bookbinding, as covers for corks in medicine bottles, for filtering in sugar manufacture, in refining gutta-percha, as wrapping paper for greasy substances and for various food products, as casing for sausages, and in many other ways.

     *       *       *       *       *       *       *

Grease-proof or imitation parchment paper (M-3) is made of sulphite wood pulp, preferably that produced by the Mitscherlich or slow-cook process. In the course of manufacture the stock is subjected to an unusually extended process of beating, which reduces it to a gelatinous condition. The first finished product of this process is a paper with a dull finish, dense and hard, resembling parchment paper in various ways, especially in the characteristic hornlike appearance above noted. The paper is not waterproof and is but partially grease proof; that is, it is not entirely impervious to grease, but nevertheless it has the quality of resisting grease to a limited extent. The paper is more tenacious than sulphite paper not so treated. It is translucent and imperfectly transparent. A part of the paper thus produced is afterwards moistened and run through supercalender rollers under heat and pressure. It loses thus its dull finish and becomes very glossy and more perfectly transparent.

The dull, uncalendered kind is known variously in the trade as imitation parchment, grease proof, and pergamyn. The calendered, transparent kind is usually

called glassine, parchmyn or japanin paper, although sometimes, as in the tariff act of 1913, also called grease proof. Both kinds are used as a wrapping for cakes and similar articles which do not require a perfectly grease-proof covering. The supercalendered variety is more useful, however, for the manufacture of an outer wrapping for bottles and boxes through which labels may be read, as the transparent material for "window envelopes," and for making sanitary protectors for telephone receivers.

\* \* \* \* \* \* \*

*Important changes in classification.* \* \* \*

\* \* \* \* \* \* \*

Vegetable parchment paper: In the acts of 1909 and 1913 this was called parchment paper. The new wording is used to distinguish it from certain fine writing papers which are sometimes called parchment papers, and because it is the ordinarily used trade designation. It is a chemically treated paper different in process of making from any other paper in the paper schedule, but has been grouped with imitation parchment paper because of the similarity of use.

Similar definitions of these terms may be found in the Dictionary of Tariff Information, published by the United States Tariff Commission in 1924, and in the Dictionary of Paper, published by the American Paper and Pulp Association, both 1940 and 1951 editions. Although it would unduly lengthen this opinion to set them forth herein, and no useful purpose would be served thereby, it is pertinent to observe that the trade publication indicates that whereas imitation parchment paper originally was intended to designate an imitation of vegetable parchment paper, it now bears practically no resemblance to it.

However, all of the foregoing definitions, as well as the brochure which is in evidence as plaintiffs' exhibit E, clearly indicate that vegetable parchment paper results from subjecting an unsized vegetable fiber or waterleaf paper to the action of a sulfuric acid bath, while greaseproof or imitation parchment paper is obtained from extended beating and hydrolization of sulfite wood pulp. Moreover, vegetable parchment paper is, to a large extent, both waterproof and greaseproof, whereas imitation parchment paper is not waterproof and is only partially greaseproof. To what extent they are otherwise separately identifiable is not established either by the record before us or by any authority we have consulted.

As to the waterproof and greaseproof qualities of the paper at bar, the chemist's report, which is stipulated into evidence as plaintiffs' exhibit D, shows it to possess both to a marked degree, and to be "within the limits of water and grease resistance for vegetable parchment paper." (Plaintiffs' exhibit 1.)

Accordingly, therefore, when the paper at bar emerged from the sulfuric acid bath, it was vegetable parchment paper, embossed. When, however, it was subsequently immersed in successive baths

of a resinous solution, it acquired a characteristic not normally attributed to vegetable parchment paper, namely, a surface coating. In other words, it has passed through a stage of being vegetable parchment paper and become something more than or different from vegetable parchment paper.

Plaintiffs' exhibit E, a pamphlet published by the Vegetable Parchment Manufacturers' Association, "giving the method of producing, the properties and uses, and other pertinent data of vegetable parchment paper" (plaintiffs' exhibit 1), presumably presents an extensive discussion of that subject matter. Significantly, it contains no reference to a process of coating by resinous solution as a possible treatment of the product.

In principle, the situation here is governed by the rule of law expressed in the case of *United States* v. *Sutherland International Despatch et al.*, 21 C. C. P. A. (Customs) 264, T. D. 46790, to the effect that a subsequent processing of an article provided for by name in a tariff statute may make of such article something more than it was and create therefrom an article which no longer responds to the original tariff designation.

As stated by the court, concerning the subject merchandise, to wit, brass channels, lined with felt:

In the case at bar, we may paraphrase the language quoted from the case last cited [*Hirsch & Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 82, T. D. 33365] by saying that it may be said that although the major part of the article here involved, in its first estate, was a brass channel, it nevertheless became something more than that when it was subsequently lined with felt. We here have the additional element, that it was dedicated to a particular use.

To continue the paraphrase, as applied to the merchandise before us, although this paper was at one time vegetable parchment paper, it became something more than that when it was impregnated and coated with a resinous solution and adapted for use in the making of lampshades. It became, in fact, a paper with coated surfaces, concededly embossed, which is *eo nomine* provided for in said paragraph 1405, as modified by the General Agreement on Tariffs and Trade, *supra*, at the rate of 4½ cents per pound and 10 per centum ad valorem.

In view of the foregoing considerations, the claims in the protests are overruled, without affirming the collector's classification of the involved merchandise either as uncoated paper, embossed, within the provisions of paragraph 1405 of the Tariff Act of 1930, as modified by said General Agreement on Tariffs and Trade, or as greaseproof paper, which is provided for in said paragraph 1405, as modified by the Annecy Protocol to said General Agreement on Tariffs and Trade, supplemented by Presidential proclamations, *supra*.

Judgment will be entered accordingly.