GERMANIA IMPORTING CO. *v.* UNITED STATES (No. 1004).[1]

1. PARCHMENT PAPER.

Parchment paper is made from vegetable fiber, not from wood pulp, is unsized, and is treated with dilute sulphuric acid. It is dull in finish, dense, hard, and hornlike. It is grease proof, waterproof, translucent, and is much more tenacious than the original material.

2. IMITATION PARCHMENT PAPER, SUPERCALENDERED AND TRANSPARENT.

Specific enumeration of an article governs as against a general classification always and the merchandise here would seem to be specifically named in paragraph 411, tariff act of 1909, providing for "imitation parchment papers which have been supercalendered and rendered transparent or partly so by whatever name known."

United States Court of Customs Appeals, February 18, 1913.

APPEAL from Board of United States General Appraisers, G. A. 7383 (T. D. 32734).

[Affirmed.]

*John Giblon Duffy* for appellant.

*William L. Wemple*, Assistant Attorney General (*Thomas J. Doherty*, special attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise involved in this case was imported under the tariff act of 1909 and was invoiced as "white glace wrapping paper."

---

[1] Reported in T. D. 33221 (24 Treas. Dec., 305).

The appraiser reported that "the merchandise consists of super-calendered, grease-proof paper known as glassine or parchmyn paper. It is intended for use in wrapping greasy substances  *  *  *." The importation was returned for duty as imitation parchment paper, and was accordingly classified as such, and assessed with duty at 2 cents per pound and 10 per cent ad valorem under paragraph 411 of the tariff act.

The importers duly filed their protest against the assessment, claiming a duty of 35 per cent ad valorem under the provision for "wrapping paper not specially provided for in this section," contained in paragraph 415 of the act.

The protest was heard upon evidence by the Board of General Appraisers and was overruled. From that decision the importers now appeal.

The tariff provisions thus called into question read as follows:

411.  *  *  *  Parchment papers, and grease-proof and imitation parchment papers which have been supercalendered and rendered transparent, or partially so, by whatever name known, two cents per pound and ten per centum ad valorem; all other grease-proof and imitation parchment papers, not specially provided for in this section, by whatever name known, two cents per pound and ten per centum ad valorem;  *  *  *.

415.  *  *  *  Wrapping paper not specially provided for in this section, thirty-five per centum ad valorem;  *  *  *.

It may be repeated that the collector assessed the importation as imitation parchment paper under the former of the two foregoing paragraphs, whereas the importers contend for its assessment as wrapping paper under the latter paragraph.

At the trial before the board the several parties introduced the testimony of witnesses upon the subject of commercial designation. Five witnesses were called and examined by each of the respective parties. The witnesses all appear from the record to have been intelligent and sincere in their testimony, although perhaps unconsciously biased by their pecuniary interest in the case. The five witnesses called by the Government testified in substance that the importation came under the definite, uniform, and general commercial designation of imitation parchment paper. The five witnesses for the importers testified in substance to the exact contrary of that statement. In explanation of this fact it is proper to suggest that the present article was not manufactured in this country until within recent years, and that the enumeration of "imitation parchment papers" first came into the tariff in the revision of 1909.

The board made no express finding upon the question of commercial designation, but sustained the assessment upon its conclusions respecting the actual character and qualities of the importation itself. The question now before the court is whether or not those conclusions are sustained by the record.

The following definitions are here quoted, that of parchment itself being of general interest only and having no direct relation to the issue:

Standard Dictionary:

*Parchment*, n. 1.  The skin of sheep or goats prepared and polished with pumice-stone for writing, painting, engraving, etc.  Vellum is a fine parchment made from the the skins of calves, kids, and dead-born lambs; while drumheads are made from wolf skins, battledores from ass skins, and sieves from the skins of he goats.  * * * Parchment-paper, n. same as vegetable parchment.  * * * Vegetable-parchment, an imitation parchment made by treating paper with sulphuric acid and water.

Murray's Dictionary:

*Parchment*, n.
4b.  Parchment-paper a tough, translucent, glossy kind of paper resembling parchment, made by soaking ordinary unsized paper in dilute sulphuric acid.

Cellulose, Bersch, p. 82:

*Vegetable parchment.*
When unsized paper, which should, however, contain no wood-pulp, is for a short time subjected to the action of quite concentrated sulphuric acid, the cellulose undergoes a peculiar physical change.  The paper loses considerably in thickness, assumes a transparent appearance, becomes harder and acquires a condition remind-ing one of horn, becoming at the same time about five times as tenacious as the orig-inal material.  When paper thus treated is moistened, it loses its rigidity and acquires the condition of animal bladder.  If stretched tight and allowed to dry, it regains its former horn-like condition.  The chemical composition of vegetable parchment is exactly the same as that of cellulose, and, hence, the change effected by parchmentizing in the above-described manner is simply a physical one.

From the testimony in the case as well as from the foregoing quo-tations, it appears that real parchment paper is made from vege-table fiber, not from wood pulp; that it is unsized; that it is treated with dilute sulphuric acid; that the resulting paper is dull in finish, dense, hard, and hornlike; it is grease proof, waterproof, translu-cent, and even poorly transparent; and is much more tenacious than the original material.  It is, however, denied in the testimony that such paper is absolutely grease proof, and it is stated that it varies in this particular according to its quality and thickness.  It is used for drawing, bookbinding, as covers for corks in medicine bottles, for filtering in sugar manufacture and in refining gutta percha, as a wrapping paper for greasy substances, as a casing for sausages, and in many other ways.  In the tariff act it is made dutiable under the general name of parchment paper.

The kind of article which is involved in the present case, and which is assessed under the classification of imitation parchment paper, is made in this country from wood pulp which is produced by the sul-phite process.  In the course of manufacture the stock is subjected to an unusually extended or continued process of beating, which reduces it to a gelatinous condition.  This produces a close and

packed texture in the fiber in proportion to the degree of gelatiniza-
tion. In case the stock is not beaten as just explained, the result-
ing product would simply be fiber paper. The first finished product
of the process above described is a paper with a dull finish, dense
and hard, resembling parchment paper in various ways, especially in
the characteristic hornlike appearance which is above noted. The
paper is not waterproof and is but partially grease proof; that is, it is
not entirely impervious to grease, but nevertheless it has the quality
of resisting grease to a limited extent. The paper is also more tena-
cious than similar stock otherwise treated; it is translucent and im-
perfectly transparent. Some of the paper which is thus produced is
afterwards moistened and run through supercalender rollers under
heat and pressure. By means of this treatment it loses its dull
finish and becomes very glossy; it also becomes more perfectly trans-
parent, which greatly increases its usefulness. The papers thus pro-
duced are used for a variety of purposes. The supercalendered paper,
to which class the importation belongs, is especially serviceable as an
outer wrapping for bottles and boxes, as the labels on these may
easily be read through the transparent covering; for the same reason
it is used in "window envelopes," and as a sanitary protector for
telephone receivers. Both kinds are also used as a wrapping for
cakes and other like articles such as do not require a perfectly grease-
proof covering.

Upon the testimony and the samples the board found that the im-
portation, in the several particulars above mentioned, imitated true
parchment paper in appearance and use, and possessed, although in
lesser measure, certain of its characteristic qualities. The board
thereupon sustained the action of the collector in assessing the im-
portation under the classification of imitation parchment paper.

This decision of the board seems to be well supported by the testi-
mony and the exhibits. It is true that the importation is not exactly
like parchment paper and does not fully possess all of its valuable
qualities. Nevertheless, it is enough like it to be called an imitation
of it, and apparently it was designed by the manufacturer to go into
use as an imitation of the original and genuine parchment paper.

The importers, however, lay particular emphasis upon the fact that
the importation is not entirely grease proof, which they claim is
always the case with true parchment paper. But on the other hand,
the article is partially grease proof, and this quality is one which gives
it a substantial part of its value. The importers also contend that
true parchment paper is always dull and never glossy, whereas the
importation is very glossy. But this argument is answered by the
fact that the paper at bar is first made in dull finish like true parch-
ment paper, and afterwards by means of supercalendering alone is

brought to the glossy finish, which makes it so nearly transparent. The language of the paragraph seems expressly to provide for this process in the provision for "imitation parchment papers which have been supercalendered and rendered transparent or partially so by whatever name known." Manifestly in contemplation of the paragraph an imitation parchment paper is not to be removed from that classification by reason of the fact that it is thereafter supercalendered and thus made wholly or partly transparent.

The court is confirmed in this view by the history of the article in former decisions and the presentation of the subject to the Ways and Means Committee of the Sixtieth Congress in the tariff hearings which preceded the present revision.

In the Wallace case (T. D. 15961, 1895) the board held that the term parchment papers included two general kinds or classes, viz, "genuine," made of cotton rags, waste, or fiber, treated with sulphuric acid, and "imitation," made of wood pulp and not so treated; and that both were commercially known as parchment papers, and therefore classifiable as such. The case arose under the tariff act of 1894, wherein parchment paper was enumerated, but not imitation parchment paper. Afterwards, however, in the case of United States *v.* Stone (101 Fed., 713, 1900) the Circuit Court of Appeals, Second Circuit, affirmed, on the opinion entered below, a decision of Townsend, District Judge, in which the following conclusions were announced:

Ordinary unsized paper, produced from rags and treated with sulphuric acid, after being subjected to two separate processes presents the appearance of parchment, is in fact parchment paper, and is commercially known either as "parchment paper," "parchment No. 1," or "vegetable parchment." Paper made from wood pulp, subjected to only the single process of immersion in an alkaline solution, is commercially known either as "imitation parchment paper," "parchment No. 2," or "grease-proof wrapping paper," and is sometimes included, in commercial language, in the general class of parchment papers. The article in question belongs to this second class. * * * It is agreed that the single question in the case is whether this imitation paper has acquired the commercial designation of "parchment paper." * * * The great preponderance of the most trustworthy evidence shows that the commercial designation of said imitation parchment is not "parchment paper." The decision of the Board of General Appraisers is therefore reversed.

This decision was acquiesced in by the Government (T. D. 22064), and was thereafter followed by the board (T. D. 22163), and resulted in placing "imitation parchment paper" in the class of papers not specially provided for in the tariff acts of 1894 and 1897.

As a result of this condition, a special presentation of the matter was made to the Ways and Means Committee of the Sixtieth Congress for the expressed purpose of securing such a change in the phraseology of the paragraph as would subject the imitation parch-

ment paper to the same duty as true parchment paper. (See Tariff Hearings, 6109–6125.) In this presentation the history of the manufacture and of the decisions of the board and the courts above mentioned were all recited, and an appeal was made for such action as would place the same rate of duty upon both kinds of articles alike.

In the submission of the subject to the committee certain exhibits were filed, and the following statements were made relative to the manufacture, characteristics, and trade name of the paper in question:

4. Process of manufacture: Parchment paper which is used for the same purposes as the papers manufactured by this company is produced by subjecting paper known as "unsized" or "waterleaf," made of cotton or sulphite fiber, or both in combination, to a bath of sulphuric acid, which renders it practically impervious to grease, while the paper manufactured by this company is rendered impervious to greases by treating the sulphite fiber from which it is made in such manner, by mechanical appliances, as to gelatinize it, making the resultant sheet of paper very dense, nonporous, and therefore practically impervious to greases.

5. Similarity of appearance: The papers manufactured by this company are not only used as a substitute for parchment paper in many cases, but they are so similar to it that it is often difficult, except by an expert, to detect any difference at all between them. Attached hereto are samples of our grease-proof paper, marked "Exhibit A," of imported grease-proof paper, marked "Exhibit B," and of parchment paper, marked "Exhibit C."

\*          \*          \*          \*          \*          \*          \*

11. Synonymous terms: The terms "imitation parchment," "grease proof," and "pergamyn" are synonymous terms, being simply trade names for the same grade of paper, and are applied to the grade of this paper which is nontransparent, and the term "glassine," "parchmyn" and "japanin" paper are synonymous and are applied to the grade of this paper which is transparent. All of these papers are produced from the same basis, the transparent grade being the result of an advanced process to which the nontransparent base has been subjected (p. 6117).

Also in Notes on Tariff Revision, 531, the attention of the committee was called to the decisions above referred to.

In the light of these facts it can hardly be doubted that Congress enacted paragraph 411 in its present form with the express purpose of making these two articles, namely, parchment paper and imitation parchment paper, subject to the same duty; nor can it be doubted that the term "imitation parchment paper" was used in the act with the same meaning as that given to it in the former adjudications and in the presentation of the subject to the committee, as above stated. That meaning plainly applied to articles of the same class with that at bar. It is true that the form suggested for the revised paragraph, in the presentation of the subject to the committee, with its schedule of various trade names, was not literally adopted in the enactment. Nevertheless sufficiently comprehensive terms were adopted to evince a congressional purpose to group true and imitation parchment paper within the same classification, without regard to trade

names, and regardless also of the possible contention that the super-calendering of the latter product would prevent its classification as imitation parchment paper.

This purpose seems to be unmistakably expressed in the provision, as it finally appeared in the present paragraph, for "parchment papers, and grease-proof and imitation parchment papers which have been supercalendered and rendered transparent, or partially so, by whatever name known," and also at the same rate for "all other grease-proof and imitation parchment papers, not specially provided for in this section, by whatever name known."

It need hardly be added that this specific enumeration of the article in question takes precedence over the general classification of wrapping paper not specially provided for in paragraph 415, which is proposed in the protest of the importers.

In accordance with these views, the court finds no error in the decision of the board, and the same is accordingly *affirmed.*