(C. D. 413)

WALKER GOULARD PLEHN CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided January 6, 1941)

*Barnes, Richardson & Colburn* (*Hadley S. King* of counsel) for the plaintiff.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Daniel I. Auster,* special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

KINCHELOE, Judge: These suits, arising at the port of Boston, Mass., are for the recovery of duty alleged to have been illegally levied by the collector on certain imported merchandise variously invoiced as Globular embossed greaseproof paper, Globular genuine greaseproof paper, or as Globular genuine embossed greaseproof paper. It was returned by the appraiser as uncoated paper covered with a design, embossed. The paper was assessed for duty at the rate of 4½ cents per pound and 10 per centum ad valorem under that part of paragraph 1405 of the Tariff Act of 1930 which, so far as pertinent, reads as follows:

PAR. 1405. * * * uncoated papers, including wrapping paper, with the surface or surfaces wholly or partly decorated or covered with a design, fancy effect, pattern, or character, except designs, fancy effects, patterns, or characters produced on a paper machine without attachments, or produced by lithographic process, 4½ cents per pound and 10 per centum ad valorem, * * *

It was assessed with additional duty of 10 per centum ad valorem as being embossed, under the continuing provision of the same paragraph, reading:

and in addition thereto, if embossed, or printed otherwise than lithographically, or wholly or partly covered with metal or its solutions, or with gelatin or flock, 10 per centum ad valorem; * * *.

The plaintiff claims the merchandise dutiable at only 3 cents per pound and 15 per centum ad valorem under that provision of the same paragraph reading:

* * * all other grease-proof and imitation parchment paper, not specially provided for, by whatever name known, 3 cents per pound and 15 per centum ad valorem; * * *.

A sample of the involved paper in its globularized condition as imported is in evidence as exhibit 1. Illustrative exhibit A shows the condition of the same paper before it was so globularized by embossing, in contrast with its condition after embossing. Exhibit 2-A represents a part of exhibit 1 which was subjected to grease-proof tests by the Government chemist at Boston by the application of oleic acid, kerosene, and turpentine. Exhibit 2-B represents the blotter placed under said exhibit 2-A to show any absorption by it of any of the said liquids penetrating or seeping through said exhibit 2-A.

Upon the trial counsel for the plaintiff expressly limited the claim herein to the merchandise invoiced as hereinbefore described.

Milton Scriber, salesman of the importing company in New York State, New York City, and also the Northeast, testified that he has sold various kinds of papers—wrapping papers, printing papers, and greaseproof papers—and has also seen greaseproof paper made;

13

that he has sold greaseproof paper such as exhibit 1 to the biscuit and candy trade for the past 12 years; that it is a woodpulp paper highly hydrated to make it resistant to the absorption of grease; that the biscuit people use the paper between the biscuit and outer wrapper to protect the outer wrapper from the grease in the biscuits, and that it serves the same purpose for the candy people. He stated further that he tested paper identical or similar to exhibit 1 to determine its grease absorbent character by making comparative tests with brown wrapping paper and ordinary writing paper, using a fresh doughnut as the most greasy thing he could find; that the brown paper and the writing paper showed very quick absorption of the grease, whereas the merchandise like that in question did not (R. 6). He also stated that greaseproofness is a comparative qualification, as there are various degrees of greaseproofness, and that in his experience of selling papers for 14 years exhibit 1 falls within the class of papers considered greaseproof (R. 7). On cross-examination he stated there are recognized tests for determining whether paper is greaseproof; that the oleic acid test is one of them, but that he usually uses turpentine as a substitute; that he did not use a fluid test on this paper, as it is globularized which causes slight breaks or pinholes in the globular surface through which liquid grease would seep, but that said holes or cracks do not affect the greaseproofness of the paper, because the paper itself is still greaseproof. He admitted that turpentine when applied to exhibit 1 would seep through the holes, but not through the paper (R. 8). The witness further conceded that the paper as imported is embossed, also uncoated, and that it is wholly or partly decorated or covered with a design, fancy effect, pattern, or character not produced by the lithographic process; that before exhibit 1 was embossed with these globular effects it was straight, flat paper without any of the cracks or pinholes in it, as shown by illustrative exhibit A, and that in that condition it will resist all the liquid tests referred to (R. 10). Also that the absorption qualities of the paper have not been changed in any way by the embossing or by the presence of the pinholes, because the paper itself would not absorb the grease, and that although grease in a loose form would finally pass through the holes, in the trade in which exhibit 1 is used loose grease is not packed.

A. G. McIntyre was the next witness for the plaintiff. He has been connected with Geo. H. Sweetman, Inc., Cambridge, Mass., since February, 1940. He testified that his real business has been in paper making since 1912; that he has designed and built five paper mills, and was manager of them, making the paper and selling it during that time. He was at a time head of the Forest Products Laboratories, and is also a charter member of the Technical Association of the Pulp and Paper Industry, and has more recently developed methods of

stamping and creating paper products, and has been working with newsprint, book, bond, greaseproof, as well as some wrapping paper. He stated he is familiar with the manufacture of greaseproof paper and that the process is the same the world over. His description thereof follows:

There is one method of grease proofing known in the paper trade, which consists of a treatment of the paper that makes it resistant to the absorption of grease. This is done by extreme hydration of the fibers. This may also be done by use of sulphuric acid. This may be done during the process of manufacturing the paper by incorporating the acid into the fibers. It is most commonly done in the United States by running the sheets of paper after being manufactured through a series of baths and washes. For the best grades as many as 8 or 10 baths, and for the lower grades as low as two, and I believe in a few cases as low as one. Some of these treatments grease proof the paper for commercial purposes, but the board itself is not grease proofed, and such board is not classified in the bracket of grease proof papers, although it will almost entirely resist the passage of grease.

The witness testified further that he handled paper similar to exhibit 1 and embossed like that while with the Sweetman Co., and he gave it as his opinion, from an examination of exhibit 1 and from his experience with similar merchandise, that the merchandise under consideration would fall within the class of papers known in his business as greaseproof or imitation parchment paper. And notwithstanding the fact that the pinholes in exhibit 1 would permit a liquid grease, as well as grease somewhat beyond the liquid state, to go through the holes in the paper, he would still consider such paper greaseproof, as in his experience greaseproof means that the fiber has been so treated that it absorbs grease less than an untreated fiber. When asked on cross-examination "Is it not a fact that as the grease goes through the holes in this paper that it will be absorbed by the fibers as it passes through?" the witness answered: "No, sir, because the paper itself is greaseproof" (R. 15).

The same witness stated that there are four well-recognized tests for determining whether or not paper is greaseproof—the oleic acid, the kerosene, and turpentine tests, as also the match test, but that so far "we have not been able to get them adopted as yet." He said exhibit 1 is not suitable for the oleic acid test; that the oleic acid test is not one which would determine the grease resistance of this paper; that if exhibit 1 resisted any of the said tests as much as 1 minute longer than untreated paper it would be classified as greaseproof paper; and that in order to be considered greaseproof paper it would have to withstand this acid test 1 minute, i. e., so far as penetrating the paper is concerned. If kerosene were applied to the paper it would be about one-half minute. The paper might be shredded or perforated with holes to allow proper circulation or ventilation of the

packed article, but it would still be greaseproof paper, and that the cracks and holes in exhibit 1 do not form part of the paper. Further, that it would take 1 or one-half minute to tell if this paper were greaseproof if turpentine were applied.

The Government called as its witness Delphine D. Greene, assistant chief chemist in the customs laboratory at Boston, where she has been employed for 18 years. She testified on direct examination that she made a test of a portion of exhibit 1 with kerosene, turpentine, and oleic acid in the following manner: She marked said portion into three sections. To section 1 she applied a few drops of oleic acid and brushed it on the surface with a camel's hair brush. In like manner she applied a few drops of turpentine to section 2, and a few drops of kerosene to section 3, first however placing said exhibit 2–A over a piece of green blotting paper, already referred to as exhibit 2–B. She states that after 2 minutes the oleic acid, turpentine, and kerosene penetrated the paper in question (exhibit 2–A), as shown by the spots on the green blotting paper (exhibit 2–B); and that so far as she knows that is the usual, common, ordinary test applied to paper to determine whether it is greaseproof. As to her qualifications, she has a degree of Bachelor of Science from Simmons College at Boston, granted in 1911, and has practised as a chemist ever since, and for 18 years has been employed as a chemist at Boston. She states that since 1911 she made various tests to determine whether or not paper was greaseproof, and that she made 200 to 300 of such tests during the last 18 years, and knows the accepted and common tests that are applied and accepted in the trade, and that the tests to show greaseproofness have been written in many textbooks. The witness then gave it as her opinion, based on her experience and the tests she made in the manner before described, that the merchandise in question is not greaseproof.

We think a fair consideration of the testimony and the exhibits herein leads to the conclusion that the paper in issue, before it was "globularized" or embossed by the producers abroad, could properly be considered greaseproof by the characteristics of the paper itself and under the liquid oil tests referred to by the witnesses. It is shown, however, and so conceded by plaintiff's two witnesses, that the said paper in its "globularized" or embossed condition, as imported, will permit liquid oil to pass or seep through the cracks or small pinholes in the surface of the paper, and that even loose grease will finally pass through the holes. The question with which we are confronted would therefore seem to be narrowed down to this—whether paper otherwise greaseproof, but which contains mechanical cracks or holes resulting from an embossing process, can still be grease-proof paper for commercial purposes?

As bearing on this point, the testimony of plaintiff's witnesses seems to indicate that greaseproofness is one of degree (R. 6, 16), and that the presence of said cracks or holes in the paper does not in any way affect its greaseproofness for use in the biscuit and candy trades, to which it is sold.

In this respect we think the tariff provision for greaseproof paper is very analogous to that for waterproof cloth. Note *Auffmordt & Co.* v. *United States*, T. D. 47792 (68 Treas. Dec. 48), wherein this court held under past interpretations of the courts that in order for cloth to be dutiable as waterproof cloth it need not be absolutely impervious to water, but includes cloth which has been subjected to a process intended to make it rain repellant sufficiently to keep the wearer dry in an ordinary shower of rain. Note *United States* v. *E. Dillingham*, 19 C. C. P. A. 210, T. D. 45297, to the same effect.

In the present instance the globularized embossed paper evidently is sufficiently resistant to the penetration or absorption of grease for the packing of biscuits and candies, and such like, to be considered commercially as greaseproof paper by such trades, it appearing that the grease in biscuits and candies will not seep through such paper to the outer wrapper, and that in the trade in which such paper is used grease in loose form is not packed.

There have been several decisions in which the classification of paper as greaseproof or imitation parchment paper was in issue, but those cases have very little, if any, application here, as the merchandise considered heretofore has been paper with an unbroken surface, to which liquid tests could more properly be applied to determine whether the fibers or texture of the paper was greaseproof or grease resistant. Note *In Re Post & Co.*, G. A. 7065, T. D. 30767; *Germania Importing Co.* v. *United States*, 4 Ct. Cust. Appls. 29, T. D. 33221; *Oklahoma Paper Co.* v. *United States*, T. D. 44143 (58 Treas. Dec. 51). In G. A. 7136, T. D. 31133 (19 Treas. Dec. 1276), it was held that a supercalendered imitation parchment and greaseproof paper, exhibiting an embossed design or fancy effect on the surface of the paper, was more specifically provided for as "grease-proof and imitation parchment papers which have been supercalendered and rendered transparent, or partially so, by whatever name known," under paragraph 411, Tariff Act of 1909, than as "papers, including wrapping paper, with the surface decorated or covered with a design," under the same paragraph.

The opinion of the Government chemist Greene that the imported merchandise is not greaseproof seems to be based entirely upon the fact that when she applied oleic acid, turpentine, and kerosene to exhibit 1 in her tests the paper showed penetration of the liquids

within 2 minutes. This we think is quite apparent from her testimony on cross-examination when she admitted that the oleic acid, etc., "probably went through the holes." We quote further from her testimony as follows:

X Q. So from the manner in which you made your tests you cannot say that those substances you applied were or were not absorbed by the texture of the paper?—A. 1 think it was absorbed by the texture of the paper. It looked just the same two minutes after I applied it.

X Q. How can you tell that that liquid went through the paper rather than through the holes?—A. I think it went through the holes first and then seeped into the paper.

X Q. So that it went through the holes first and then seeped around on the paper?—A. Yes, sir.

X Q. So that when you said you detected the presence of an oily substance on the underneath side of that paper, it was probably the oil substance that had gone through these holes?—A. That is right. (R. 25, 26).

We think the only definite fact that can be deduced from the foregoing testimony is that the said liquids penetrated or seeped into the paper as a result of the holes. Under the circumstances we feel that the said liquid tests applied to the paper in question for determining its greaseproofness, and which may ordinarily be used in the case of papers with flat or unbroken surfaces, are hardly practical in the case of globularized embossed paper with mechanical holes. Furthermore it is not shown that the Government chemist had any knowledge or familiarity with the manufacture of greaseproof paper or its commercial uses, or in fact had any previous experience with globularized paper like that in question. Her testimony therefore hardly can have as much weight as that of plaintiff's two witnesses, who are shown to have had long experience either with the manufacture, sale, or use of greaseproof paper, and who are also familiar with the usual tests used for the determination of greaseproofness, and from whose testimony it would appear that the imported paper is greaseproof in itself, and that the cracks or small holes in the globularized surface of the paper in the present instance, as a result of an embossing process, do not affect its use commercially as greaseproof paper for the trade by which it is used.

The protests claiming the imported merchandise to be dutiable at 3 cents per pound and 15 per centum ad valorem under the provision of said paragraph 1405 of said act of 1930, for "all other grease-proof paper and imitation parchment paper," are therefore sustained. Judgment will be rendered accordingly.